only case. Oh, wait. 16 53. Rebecca has more. Robert Robertson, along with my partner, Jeff Neslin, on behalf of Miss Hester, Ruth Masters on behalf of the city of Chicago. Could not hear you. Ruth Masters on behalf of the city of Chicago. Good morning. Thank you. Please proceed, Mr. Robertson. Thank you, Your Honor. I just wanted to make the court aware of one small matter. Mr. Neslin and I are on jury trial in federal court. Actually, we have two juries, one out and one going, and the judges have ordered us to make at least one of us available. So if Mr. Neslin has to leave and gets up, it's not any disrespect to the court just to comply with the judge's order. What time does he have to leave? It doesn't matter, because you all will be finished in 30 minutes. Yes. No, I know. I know, Your Honor. But we said as soon as we said, come over here, something was going to happen. But thank you. I appreciate you arising us. Please proceed. Sure. Your Honor, this case presents a truly fascinating legal issue and one that has not been explored by case law up until this point in time. Now, we have a situation here where the trial judge is ruling below, interpreting a whole line of cases coming out after the Illinois Supreme Court's decision to dismiss, where several building code cases came out afterwards, Ware, Bowler, and then Anthony. And all of those cases have kind of followed the line. And all those cases have been put in a neat little box, and it's been ruled that the city either has no duty or is This case is entirely different from any of those. And that's what I want to stress more than anything else. This is not a case that's like those other cases, which involved the failure to act or a failure on the part of the municipality to do its job. This is a case where a worker went out, a building inspector went out, and took affirmative acts beyond his authority, did not go to housing court, did not do any of the things he was supposed to do, went out to a site where a porch was in the process of being built, where the handrails were off. And at that point, he unilaterally, without authority, stopped construction. The maintenance worker was up there. They were in the process of cutting the handrails. So we have a porch going up levels with no handrails. And at that point in time, the city inspector comes out and says, stop. Do no more. With that, we have... Of course, there was... I mean, he didn't just stop it arbitrarily. There was no building permit. That's correct, Your Honor. Isn't that correct? That is absolutely 100% correct. And he didn't have the authorization to stop work if there was no building permit? That's correct. He did. He did not have authority. He did not have authority. No. And that is, it's testified to in the record that the building inspectors would frequently go out and do that. They would tell people, you have to stop work. But they knew they had no authority to do it. Mr. Tekash, who was the building inspector who oversaw this maybe for about a year, year and a half earlier, said that. Like, oh, yeah, I tell people all the time they have to stop work. You know? Even there's testimony, I'd even tell people that we're going to put them in jail. No authority to do that. What they're going to do is go to the Department of Conservation, go into Housing Court, and properly have a judge decide this. So a judge may weigh the factors involved. The judge could have decided to condemn the building, could have decided to order something different, rather than just leaving the hazard up there in a suspended state of danger. And beyond the stopping of it, we have the situation where he goes out and he says, hey, put up some yellow caution tape in this case. Could actually be worse than handrails because it could give an appearance of something that's there. You know, something that's there. This took place at night from an individual who was invited onto the residence, not someone who was familiar with the building. So, you know, whether I argue that could have made it worse or not, there's testimony in the record from one of the city's former head inspectors who said, Mr. Price, who said that that situation with the caution tape and the stopping of the work made a bad situation worse and exacerbated the danger. I mean, that's the evidence that's in the record, that they had no authority to do it and that what they did made the situation worse. Now on top of it, we have the situation where other city inspectors who are unknown come back. And at that point in time, after Mr. Rose has been threatened with jail, after he's got the caution tape up, the city inspectors come back, look at it, now in the situation with the no railings, with the caution tape on there, and what do they say? We just wanted to come by to make sure you weren't doing anything on the porch and good you got that caution tape up. And what? And good. We're glad you got that caution tape up. So, I mean, this is kind of, you know, the fire department has their own situation there and they are responsible for those affirmative acts that create a danger. You know, this is not a situation where it's a failure to provide services. That's what the public duty rule is about. You know, that is what, you know, a situation where, you know, police don't get to a situation on time. Fire department doesn't get to a situation on time. They can't be held liable for failure to provide service because they didn't get there in time. We don't have that situation here. We have a situation where the inspector gets out there and he actually makes the situation worse. Now, if he hadn't gone out there, there would be no liability under this line of cases, under Ware, Fowler, Anthony. If the city had... Absolutely, if he hadn't gone out there, he wouldn't have been doing his job. That's his job, to go out there. And you know, it seemed...weren't they actually being conscientious in performing their jobs as described? Judge, with all due respect, I think with going out there, I don't think they were being...they may have been going out there to be conscientious, but what they did once they got there was the furthest thing from conscientious. They didn't follow up properly. Maybe they didn't want to. Maybe they just wanted to shortcut it and wanted to come in and decide, okay, I don't want to go down to the Conservation Bureau. I don't want to go down to Housing Court. I'm just going to do what I think is best. And when they're doing that, they're not following their authority and they're responsible for those actions. And the city, as their employer... Between the time of the one inspector who told them to stop work and the next inspector, how much time? It can't be too long, Your Honor. I think...I'm not exactly sure, but I think it's approximately a month, give or take, a little bit. Time enough to get a building permit? Probably, Your Honor, yes. And that's why Mr. Flores and Mrs. Flores, the owners of the building, are also being sued. But both of these parties came together to form this situation. It's not something that just can't be put on Mr. Flores. You know, it was something so easy, hey, look at Mr. Flores. We'll just put it on him. We would have done that. This is a situation where both of these parties are responsible for what happened to Ms. Hess in this case, which were massive injuries. Did the second inspector reiterate anything about stopping the work? I believe from the record, and I'm not sure, and if I'm incorrect, I'd like someone to correct me, but I believe what they said was, we wanted to make sure you weren't doing work on the porch. Good thing you got the I apologize, but that's what I believe. Wasn't at least one of those inspectors that came subsequent not there for that property, but something in the property next door and just happened to look over? Judge, that could well be. I thought that they may have been going for other things on that property. For the property itself? For the property. It's like a multi-unit building, and the housing code violations were not limited to the porch. There were a number of other things, and I think they came by to check on those other ones. And I think that this affirmatively creating or exacerbating a hazard is what shows that the city has a duty for that, and because it's their employee who did this, created this through affirmative acts. We have the first argument on the duty that you have a general duty of due care to avoid harming other individuals. That's true for municipal employees as well, in the sense that officers who get in car accidents. It's the same thing here. This is an affirmative act of even of negligence will create a duty situation. Now beyond that, there's what the city has raised in that the special duty rule, and I want to talk a little bit about that because that comes up as the public duty rule as an exception to the public duty. If you do have a failure, and this is not a failure, but if you do have a failure, you can still have liability or duty predicated upon what the relationship is between the municipality and the individual in question. Those are those four factors that are laid out. Uniquely aware of the particular danger, so forth and so on, and it must occur when the injury occurred when it was under the control of the municipal agents. Isn't that kind of crucial here? There was no city employee in control of the situation or seen at the time of the injury? I agree 100%. Isn't that fatal to your argument about the special duty exception? It's not, and I realize that this is the weakest part of our argument, and that's why I wanted to raise it at this point in time, because I think what it really does is supports the distinction that runs throughout our brief, the affirmative slash passive inaction. In this case with the special duty, we cite the Callaway case, there's either two ways you can recover, and this is mixing all across the board, and I apologize, but these cases, this is one of the most complex areas of law that I found, these cases kind of run intermingle, but you can recover either when there's willful and wanton acts on part of the municipality that proximately caused the plaintiff's injury, or the application of the special duty doctrine with allegations of negligence on the part of the municipality. We're not claiming negligence here for purposes of the immunity purposes, but just for the duty. The duty does not have anything to do with the immunity, it's just a duty. So if you have special duty with negligence, there is a duty. Now we have that special duty, the four elements. Now I grant you 100% that after the cases that have discussed this, they pretty much rejected this control element. However, I rely on cases like that Moran case, where they talk about the control element being satisfied if the plaintiff's injuries are caused by the actions of the municipality. So... And what case is that? The youth center? I think that's Murray v. Youth Center. Let's see. Here it is. Moran v. The City of Chicago, 286 Gillap 3rd at 746. And that's where the control element of the special duty doctrine can be satisfied absent direct control over the plaintiff where the actions of the municipality initiated the circumstances that created the dangerous condition. So that's where I would be relying on that four. Now we don't need the special duty doctrine because we have the affirmative acts. That's only for cases involving negligence. How did the city's actions initiate the circumstances which created the dangerous condition? Initiate, that's what you say Moran says. Right, Your Honor. And I think that I know where Your Honor is going in terms of the initiation with taking the railings down versus the city's actions in this. Yes, absolutely. It would be, well, the actual hazard that wound up injuring Ms. Hess was not just the absence of the handrails, but it was the absence of the handrails with the caution tape that stayed there so long. Mr. Flores didn't initiate the caution tape. That was the city that did that. So while Mr. Flores and Mr. Rowe may have initiated the initial hazard, the city initiated and added to an additional part of the hazard. So that's what the actual hazard itself at the end was contributed to by the city and by Mr. Flores. So that's where I would say the initiation comes in. I know it's not traditional use of the word initiation, but I think it's consistent with the concerns in the case law. And your argument is that because there is a the plaintiff was led to believe that there was something more substantial there than a tape? Possibly. What do you base that on? Possibly, Your Honor. That's just what I'm saying. All we have in the record, well, Ms. Hess, you know, was, became, she had serious injuries and was never, I think, really able to develop that and she was never asked that. But we have the testimony from that expert that talks about the situation going from bad to worse. And then because the city initiated putting the tape up, then, therefore, you were in control. Well, that therefore they contributed to the dangerous condition. And I'm using that term initiated in there. So we don't need that because we have the affirmative acts and we've pled both in one. But for the duty purposes, that's also there. This is not, this is not a point, we have to meet all four of the theories we've put forth. We just have to meet one of the four. Affirmative actions on the part of the city, creating it, or the special duty doctrine, or even as we split, set out in the Torres case, the assumption of the duty. At Torres was that 911 case where the city was called. The police officer said, there was an injured individual. Hey, don't do anything. One of the bystanders wanted to help. Don't do anything. We got it. And the guy wanted to die. So in that case, the court said, this court, I believe, said, not your exact justices, but the first district said, even if there was no duty to begin with, when they came in and they took control and they stopped others from helping, then they assumed a duty. So in all these instances, we have a situation where the city owed a duty to Ms. Hess. Now, the second issue I wanted to talk about was the immunity issue. And the immunity issue comes into play with the Illinois Supreme Court's new decision, the Reese case, and I wanted to just touch on its application to the two sections we have here, 2-105 and 2-107. Now, with the 2-105 and 2-107, we have the same type of distinction, affirmative versus passive or failure. And it's important in this case because it goes to the wording of the statute. The statute's in question. Both 2-105 and 2-207, which talk about the immunity provisions for the housing projects, both specifically give immunity for two types of actions. One is a failure to act, okay? That is unqualified. I would agree that is absolute. And that is consistent with the public duty doctrine. That's consistent with everything. If the city fails to do something, they are not liable. The second part that they're immune from under 2-105 and 2-207 is inadequate or negligent inspections. The legislature specifically qualified this. They didn't give blanket immunity. They didn't say in all instances, they said inadequate or negligent inspections. We don't have here inadequate inspection. It's not like they missed the porch. We don't even have a negligent inspection. It's not like they missed it. What we have here is not even an inspection. I mean, he went out and inspected. But what he did after that, the ordering of the stoppage of work, not his authority. Put up the caution tape, not his authority. Not an inspection. You're going to go to jail. Not his authority. Not his, you know, not within his power. Those are not inspections. But the only reason he's there and able to take those acts is because he's an inspector and in there as part of his duties of inspection. It's the only reason why he's there and taking whatever actions he did. You know, and I understand exactly what And I think that if they wanted to give blanket immunity to building inspectors, they could have said something simple like in the execution of their duties, like they do with the police provisions. It's not, you know, like in executing their duties, it's a much broader language than some of the immunity statutes. It's not that here. It's specifically inadequate or negligent inspections. And, you know, that Murray case, that's the Youth Center case, talked a little bit about that, those differences there when the court uses, when the such as qualifying negligence. And also the DeSmit case, the Carr and the Adich case, when they use certain states and don't use others, it's an indication that it's not an absolute provision. What we have here is a provision that specifically only applies to the failure, absolute, or negligent or inadequate inspections. And this was not one of those. And such an interpretation is consistent with Section 2-202. Now, this whole thing, 202 has been flipped up on its head because we're the ones arguing that 202 applies, which is a limiting provision upon us. It says that we will not be able to recover unless we prove both and one. And we're doing that out of a position of intellectual honesty because once you get by that initial immunity, negligence, inadequate, and if that does not apply, we're not home free. You know, at that point in time under 202, we still have to meet the Wilson and Watten burden. So in that respect, those provisions, 2-105, 2-207, and 2-202 are all being read consistently. They make sense when you read them that way. The way the... Okay, so let me just understand. You're no longer arguing that 202 must be read in conjunction with the other 2-105 and 2-207 to create a Wilson and Watten exception? You know, I'm arguing that they should be read in conjunction. Now, maybe I misphrased it earlier, but what I'm saying is if you read them together, it's not that 202 by itself creates a Wilson and Watten exception and gives us something that we don't have. I'm not saying, look, we have a cause of action because 202 is there. That's not what I'm saying. What I'm saying is once you get by 2-105 and 2-207 and that immunity provision does not apply, we're not home free. At that point... And you're saying it doesn't apply because there's been some affirmative acts by the inspectors? Well, I mean, exactly. We don't have an inadequate... We're saying they don't apply because, one, there's affirmative acts, which knocks out the failure. And two, we have affirmative acts that result in Wilson and Watten misconduct. And that gets us by inadequate and gets us by negligent. And we also believe this is not an inspection at all. So then your reading of those sections are a little contrary to the case law that says you only find that they exclude Wilson and Watten conduct if it's specifically stated so in the immunity provision. I think there's cases that go both ways on that. And I think the Murray case is one that talks about, the Youth Center case talks just like what Your Honor said. But that provision is... It's not just that if it accepts Wilson and Watten, because like we're saying with respect to the first part, the failure, that doesn't accept Wilson and Watten. We're saying if this was a failure case, we'd be out. What we're saying is once the legislature specifically talks about specific qualified mental states and puts the term negligent in there, inadequate, they know that they have excluded Wilson and Watten by their failure to use it within that statute. Isn't that contrary to our decision in Ware? I think... I don't think so because in Ware, I'm viewing it as two different hurdles we have to go over. In Ware, what they did is they pitted them together. They went in there and said, hey, listen, you don't have to have 2105 or 2207. We got 2202. And 2202 says all we need is Wilson and Watten's conduct. Okay? And it was just like kind of some kind of like, oh, you lost a tiebreaker because the specific 2105 and 2207 controls over 2202. We're not saying that. We're saying we have to get by 2-105 and 2-207, okay, which we believe we've done. And at that point... And you believe you've done it because of the... it doesn't meet the requirements in terms of inadequacy or negligent inspection. Right. The actions here weren't a failure. They weren't inadequate. They weren't negligent. What they were, were completely beyond the authority. And so therefore, you don't think there's any applicability whatsoever to this case of 2105 and 2207? Well... They're not applicable. Your Honor, I think that the applicability at this stage is no longer there. I mean, initially, there's a, you know, with the whole host of housing code violations that were present on this property, this case followed that Lincoln... Ware case, the Lincoln Park porch collapse case, and was patterning it for a while with the negligence, with the negligence theory. At that point in time, Mr. Rowe had not been deposed. Mr. Rowe comes up and he flushes all this out. He gives us the affirmative acts, the tape, the city ordering this, the threats of this from a Ware situation to something totally different. So, because we have all the affirmative acts, we have the actions by Mr. Rowe ordering the tape, I mean, sorry, by the building inspector ordering Mr. Rowe to put up the tape threatening jail, coming back and checking on it at a later date. We have all those actions. So we believe those actions would satisfy the Willful and Wanton section. May I just confer with Mr. Neslin for one second, please? Thank you very much, your honors. Will I get a brief rebuttal or not? You will. Okay. I'll keep it brief. Thank you very much. Thanks, counsel. May it please the court. It is undisputed that on June 9, 2004, a city building inspector went out to the property, determined that repair work was being done in an unsafe manner that worsened the condition of the porches, caused him to be concerned for tenant safety, and that he felt might endanger lives. For summary judgment purposes, we accept as true that the building inspector issued the stop work order when the handrails were down and that he ordered the placement of yellow caution tape. Passes arguing that this is the conduct that was willful and wanton, breached a duty to her, and that the city has no immunities. I want to begin with a proposition that whatever else it might be, the city's conduct in this case was not willful and wanton. By definition, under the Tort Immunity Act, willful and wanton conduct shows a deliberate intention to cause harm or utter indifference to or conscious disregard for the safety of others or their property. A municipality that stops unsafe construction requires a building owner to obtain a permit and orders the placement of caution tape as a matter of law simply not behaving in a willful and wanton manner. Now, Ms. Hess raises many arguments regarding duty and immunity. As we set forth in our motion to cite supplemental authority, Reese versus the City of Chicago, Reese has nailed shut the viability of many of the arguments that Ms. Hess is still making regarding duty and immunity. To begin, Mr. Robertson just referred to some duty to not engage in willful and wanton misconduct. There is no freestanding willful and wanton duty of municipalities. That was resolved even before Reese, but is reaffirmed by Reese. Reese also makes clear that Section 2202 of the Tort Immunity Act does not provide a source for such a duty. This leaves Ms. Hess at this point with two arguments that she can still possibly make, that the city owed a special duty to her or that we engaged in involuntary undertaking. Under the public duty rule, which is actually a no-duty rule, the city doesn't have a duty to provide government services to members of the general public. As where held, under the public duty rule, the city does not owe individuals a duty to protect them against an inspector's alleged willful and wanton conduct. There is no distinction in where that is based upon affirmative acts or failure to act. And in fact, that idea of affirmative action versus failure to act has been rejected by Reese, which just pretty much labels it semantics, and by Arizzi, which is specifically a porch case that says there's no meaningful difference between allegations that a city has failed to enforce an ordinance versus an allegation that the city has violated its Under the public duty rule, we didn't know Ms. Hess a duty. There was no special duty to her. She was not within the city's control at the time of the accident. And also the city was not uniquely aware of the danger posed by a stairway that had caution tape up. Well, to her in particular, I think that's, I mean, they could generally know the danger to the public, but the danger to her in particular was not known. Right, that's correct. We didn't have any particular knowledge that there was a danger to her. Council mentioned Moran as a special duty case. We're sort of baffled by the reference to that because in Moran, in fact, no special duty was found. And that was a situation in which the police, there were police officers surrounding the plaintiff. And while the police officers are surrounding him, he gets attacked by somebody else. And even in that situation, there was no special duty case. It has this other duty argument is that the city engaged in a voluntary undertaking by issuing a stop work order and the placement of caution tape. But the only undertaking the city engaged in was to enforce the housing code. Tell me more about the argument that they weren't just enforcing the housing code, but they called for a stop action when there was no railing protecting the porch. And that is part of enforcing the housing code. Because the work, the back history of this is two years of housing court proceedings, administrative proceedings and housing court proceedings in which the inspectors have noted and brought to the court's attention. Are you saying that the inspector did have the authority to stop work? Oh, as to the authority, let me make a few points about that. First of all, the city of Chicago is the defendant. I don't understand your answer. Was that a yes or no? Well, my answer is that the city is the defendant and the city has the authority to stop work here. And as to whether or not this particular agent, this particular inspector had authority, even if we concede he didn't, this particular person didn't, the testimony, the defendant is the city, the city has authority, and the testimony is that in the following days, two other inspectors came out to the property and basically approved of the stop work order. And that's what the testimony in the record is about as well, is that inspectors from the division that the first inspector came from don't have authority to issue a stop work order, but they can go back to the office, tell their supervisors, and then the proper people can come out and do it. And the other point You're saying that's what happened here? Yes, we are saying that. That the first inspector didn't have authority, but he went back and the other inspectors did have authority to enforce a stop work order, and therefore What I'm saying is that the city is the defendant and the city has authority to issue a stop work order and enforce it. And we certainly think that's what happened here. We don't know about the particular individuals and their particular authority. We do know there's no question that the city can issue a stop work order as part of enforcement of the housing code. So in that way, the argument that somebody exceeded their duty just, it's irrelevant to the case here. And what about the yellow tape being, making it illusory that there was a railing there that it just exacerbated the danger of the condition to an individual unfamiliar with what was going on on the back porch? Your Honor, there's, first of all, there's no testimony that it rendered it illusory, that someone couldn't see this caution tape. And the second part I would point, I would make about that is that it's, that the city comes out and they stop work, but they don't say you can't put up any other caution devices. That's up to the private property owner. It's the private property owner who has created the situation here. It's the private property owner. I thought the testimony was that the, that the inspector ordered the yellow tape be placed. That's, is that something contrary to? No, we assume that for purposes of oral argument, yes. And for summary judgment, we assume that the inspector ordered the placement of the caution tape, but the caution tape doesn't make, there's no support for the idea that the caution tape makes the situation of dangerous porches worse. The handrails were already down. The property owner could have and should have in the first instance gone out and got a permit. He didn't. The responsibility for what happens here lies with the property owners who are supposed to be complying with the law, not with the city of Chicago who comes out and says stop what you're doing. You're not complying with the law. And to the extent we order caution tape up, that doesn't make anything worse than a situation without handrails. It's, I mean, the property is unsafe and the building owner is making it worse. Well, counsel, if, as they were, if they were, they recently taken down scaffolding across the state of Illinois building. And if someone was in the midst of erecting scaffolding and it was half done, it was half hanging, it was, you know, suspended over the public and the, and the city came in and said, you don't have a building from the state of Illinois. Stop working. And they did so. And then the scaffolding subsequently fell on someone's head. Isn't that an affirmative action that the city would have taken which resulted in a hazard to one of its citizens? And wouldn't the city be responsible for that? The city would not be responsible because the city is not responsible for the fact that someone has begun unlawful construction. It is up to that person to not begin to do that in the first place. But if they addressed the unlawful construction right at its most dangerous point, is that not a willful and wanton behavior on behalf of the city which led to the, to the harm that was engendered? Well, plaintiff's argument to that effect requires the court to hold that the city is behaving in a willful and wanton manner when it enforces the law. And that can't, that, that prospect. When it enforces the law. When it stops work. Which the inspector didn't have the authority to do in the first place. You've already said that today. That it didn't have the authority to stop the work. But it stopped work at a point where there was no porch railing. And then someone got hurt. The city has the authority to stop the work. The inspector didn't. But the city does. And the city came out with two other people. And the city is the defendant. And the fact of the matter is, Miss Hess was not injured for two months until two months later. The property owner could have, was supposed to have gone out and gotten a permit to resume work. And that didn't happen. Didn't the city also get a order from the housing court that the use of the stairs would be limited and warnings were given to the... That is correct. And of course the city also has immunity in this situation under Sections 2105. That's the question. That is why we're here. Does it have immunity when it engages in those types of behaviors, those affirmative behaviors? And it does. Because again, I would turn to Reese v. City of Chicago, which frowns upon the idea that you can use semantics and make these types of arguments of affirmative v. failure to enforce actions to get around the scope of immunities. Now 2105 and 2207 are immunities that specifically deal with inspections and that specifically do not include an exception for willful and wanton misconduct. Where held that those were absolute immunities. And in Reese, the Supreme Court cites to where, cites to those immunities and says, basically approves of that. It says, you know, those sections do not have an exception for willful and wanton misconduct. That means they are absolute immunities. There are other cases like Rasher, which hold that the determination of whether something is a hazard is part of the inspection process. And that's what happened here. What happened here was part of the inspection process and 2105 and 2207 are squarely applicable. The other point that Reese makes clear is more specific immunities govern over more general immunities and this is a more specific immunity than section 2202. If the court has no further questions, we would ask that for the reasons set forth today and in our briefs, that the circuit court be affirmed. Brief rebuttal. Reese doesn't mention duty at all. At all. It's totally an immunity decision and the portion that cites where does so with approval but does say to those cases in which where applies. And we would argue that where does not apply to this case. The conduct at issue and where we were talking about like the you know the failure to catch certain violations, the wrongful approval of certain blueprints, things of that nature. Nothing that had to do with going out and of the nature we talk about here. With respect to the willful and wanton, we have a testimony of Mr. Price who is the former head of the city inspector and he testified unequivocally no authority to stop issue to issue stop work orders and that it created taking a ordering the yellow tape with the handrails being down created a bigger problem you started with left a bigger hazard and left the situation worse more dangerous than it was. That's what he said. And finally, I just wanted to clarify the aspect of the willful willful and wanton. What we are saying is because all the cases where Anthony Fowler, all those cases are solely cemented in that failure to act or there was there were some they weren't strictly failure to act at least one of them. I don't forget which one of the ones deals with that the guardrail around the rooftop was too low. Yeah, that the city had actually approved the blueprints for that. I mean, so they're the distinction sometimes between a failure to act and an affirmative action. It's not real clear. Well, I don't think I certainly think that if I were up here arguing the Fowler case, you know, I would be much happier to have the case we have in front of us because that's there we have a lot more affirmative action there. You know, the approval of a blueprint that would certainly could fall into the negligent aspect of it or the inadequate aspect of it and not just simply a failure. But with all the actions we have here that qualifies as the willful and want. And I think one of the interesting cases is that Anthony case and it's not interesting it's the E2, E2 one and it's not interesting because of any accounts that were pursued by the city. But by one account that wasn't pursued. And in that case you had history of building violations. Hey, go out there. The city should have done this. The city should have done that. There was one account I think against the police officer who was blocking the door. That never came up. They didn't even make some re-judgment on that. And that's kind of more what we have here. We have an individual creating that part of the hazard. And that's what Mr. Leslie is accused of doing in this case. And let me know if the court has any other questions. Thank you very much. Well, the cases that you cite for the duty of the city not to create a hazardous condition seem to be distinguishable from this case in that it was hazards alleged to       a city plan for street lights, et cetera. This doesn't seem to be what's here. This is private property. And that's what the city has to do. And that's what the city has to do. And that's what the city has to do. You know, I agree with your honor on that portion that that's what the case is saying. I would say that if, you know, if I found the case more analogous or closer on point, I certainly would have told your honors about it. That being said, I didn't find anything the other way. You know, if I would have found the case saying, hey, there's this private public distinction, we wouldn't even be here. Why waste all our time? And it's just not there. And I think that it's easier in the case of a land owner, when the city's a land owner and they're actually doing things, to see the duty clearer and more outright. But this is like more similar to the police officer who runs into another car or a city worker who's out and accidentally runs into a     create the injury or approximately cause the injury to the plaintiff. So that's where the basis of liability is. And I tried to structure, we tried to structure as much as possible to make sure that we were able to do what we were able to do. the general principles. You know, you start off with the general principles. Municipality is the same as an individual. You know? Then you go from there. You know, go through the duty analysis. Then you have the immunity analysis. And going through each one of those steps in this case, and this is a unique case, this grant of summary judgment is inappropriate in this case. Thank you. Thank you counsel. Thank you both very much. This matter will be taken under advisement. This court is adjourned.